# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GOLD ANTI-TRUST ACTION COMMITTEE, INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, )<br><br>Defendant. ) | Civil Action No. 09-2436 (ESH) |

## <u>MEMORANDUM OPINION</u>

Plaintiff Gold Anti-Trust Action Committee, Inc. ("GATA") brings this action against the Board of Governors of the Federal Reserve System ("Board" or "FRB") pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 et seq. Plaintiff seeks access to documents for the period 1990 to 2009 relating to "gold swaps." In response to plaintiff's FOIA request, the Board produced nine documents, but withheld or redacted others pursuant to Exemptions 4 and 5. 5 U.S.C. § 552(b)(4), (5). Before the Court is defendant's motion for summary judgment, which, for the reasons explained herein, the Court will grant in part and deny in part.

## BACKGROUND

### I.    2007 FOIA REQUEST

In a letter dated December 6, 2007, GATA submitted a FOIA request to the Board seeking copies of all records relating to "gold swaps" from January 1, 1990 to December 6, 2007. (Compl. ¶ 7; Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment ["Def.'s Mot."] at 2 n.1.) The Board responded on April 9, 2008,

disclosing in full or in part 98 documents and withholding in full 144 pages of documents. (Compl. ¶ 8 and Ex. B; Declaration of Alison M. Thro ["Thro Decl."] ¶¶ 3, 9.)

GATA appealed the partial denial of its 2007 FOIA request by letter dated May 5, 2008. (Compl. ¶ 9.) The Board denied the appeal on June 3, 2008. (*Id.* ¶ 10.) This 2007 FOIA request is not itself the subject of this appeal.

## II. 2009 FOIA REQUEST

By letter dated April 14, 2009, GATA submitted a second FOIA request that is at issue here. (Thro Decl. ¶ 3 and Ex. 1.) This request sought "all records in the possession or control of the Federal Reserve Board relating to, explaining, denying or otherwise mentioning: 'gold swap,'[1] 'gold swaps,' 'gold swapped,' 'proposed gold swap,' 'proposed gold swaps,' or 'proposed gold swapped' during the time period January 1, 1990, to the date of this request either (a) involving the United States of America or (b) not involving the United States of America." (*Id.*) The request further identified eighteen subcategories of documents provided "in an effort to particularize certain categories of records" covered by the request, including "[t]he records withheld by the Federal Reserve Board in response to GATA's December 6, 2007 FOIA request." (*Id.*)

The Board responded on August 5, 2009. (Compl. Ex. B; Thro Decl. ¶ 6 and Ex. 4.) The Board advised GATA that "other than the records withheld in connection with plaintiff's 2007 FOIA request," only two additional responsive documents (totaling 173 pages) had been identified, which were provided to GATA. (Thro Decl. ¶¶ 6, 9, 17, and Ex. 4.) The Board's

---

[1] The IMF Monetary and Financial Statistics Manual ("MFSM") defines gold swaps as "forms of repurchase agreements commonly undertaken between central banks or between a central bank and other types of financial institutions. They occur when gold is exchanged for foreign exchange, at a specified price with a commitment to repurchase the gold at a fixed price on a specified future date so that the original party remains exposed to the gold market." MFSM ¶ 154 (2000), *available at* http://www.imf.org/external/pubs/ft/mfs/manual/.

letter informed GATA that the pages withheld in response to the 2007 request had been reviewed again, no additional portions could be released, all the originally withheld material was exempt from disclosure, and there were no reasonable segregable, disclosable portions. (*Id.*)

GATA administratively appealed the Board's partial denial of its 2009 FOIA request on August 20, 2009. (Compl. ¶ 18 and Ex. C; Thro Decl. ¶ 7 and Ex. 5.) By letter dated September 17, 2009, Board Governor Kevin Warsh denied GATA's administrative appeal. (Compl. ¶ 19 and Ex. D; Thro Decl. ¶ 8 and Ex. 6.) Plaintiff subsequently filed this suit on December 30, 2009. (Dkt. #1.)

Thereafter, the Board again reviewed the withheld documents. (Thro Decl. ¶ 9.) These documents had been withheld in response to the 2007 FOIA request and were thus explicitly covered by the 2009 FOIA request as well. (*Id.*) Following this review, the Board released an additional 7 documents (13 pages) in full and 19 documents (3 full pages and 49 redacted pages) in part. (*Id.*) These documents were transmitted to plaintiff on June 10, 2010. (*Id.* ¶ 9 and Ex. 7.) The volume of materials withheld in whole or in part now stands at 20 documents, including 49 pages produced with some redactions and 77 pages withheld in full. (*Id.*) The Board bases its withholdings on Exemptions 4 and 5, and it has produced a *Vaughn* Index, which identifies the date, subject matter, author and recipient (where possible) of each document withheld, and the length of the document (number of pages); describes the contents of the documents generally; and states whether the document was withheld in full or provided in redacted form and the FOIA exemption under which the redacted or withheld information is being withheld. (Thro Decl. Ex. 8. ["*Vaughn* Index"].)[2]

_____

[2] The *Vaughn* Index also specifies whether each withheld document "mentions or relates" to gold swaps. (Thro Decl. ¶ 19.) The Board has indicated that 17 of the 20 documents withheld in full or in part do not relate to gold swaps at all, but instead pertained to, for example, the "gold and

Defendant has moved for summary judgment contending that its application of FOIA exemptions was proper.  (Def.'s Mot.)  Its motion is supported by declarations from Alison M. Thro, Senior Counsel in the Board's Legal Division; Timothy Fogarty, Vice President in the Markets Group at the Federal Reserve Bank of New York ("FRBNY"); and Richard Dzina, Senior Vice President in the Markets Group at FRBNY.  Plaintiff challenges the adequacy of the Board's search, as well as the applicability of Exemptions 4 and 5.  (Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment ["Pl.'s Opp."].)

On January 10, 2011, the Court granted plaintiff's motion for *in camera* review of the withheld or redacted documents (Dkt. #21), and it has relied on this review in reaching the conclusions of law set forth below.

## ANALYSIS

### I.     STANDARD OF REVIEW

The Court may grant a motion for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating an absence of a genuine issue of material fact in dispute.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Factual assertions in the moving party's affidavits may be accepted as true unless the opposing party submits his

---

foreign exchange market" or currency swaps.  (*Id.*)  These documents are responsive to GATA's current FOIA request only because they were withheld pursuant to the 2007 FOIA request, and they were deemed responsive to *that* request because the staff conducting the earlier search employed broader search criteria that identified documents relating either to gold or to swaps. (*Id.*)

own affidavits, declarations, or documentary evidence to the contrary. *Neal v. Kelly*, 963 F.2d 453, 456-57 (D.C. Cir. 1992).

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (citations omitted). "In a FOIA case, summary judgment may be granted to the government if 'the agency proves that it has fully discharged its obligations under the FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester.'" *Fischer v. U.S, Dep't of Justice*, 596 F. Supp. 2d 34, 42 (D.D.C. 2009) (quoting *Greenberg v. U.S. Dep't of Treasury*, 10 F. Supp. 2d 3, 11 (D.D.C. 1998)).

"An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)); *see also Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994). To meet its burden, the agency may submit affidavits or declarations that explain in reasonable detail the scope and method of the agency's search. *Perry v. Block*, 684 F.2d 121, 126 (D.C. Cir. 1982). In the absence of contrary evidence, such affidavits or declarations are sufficient to demonstrate an agency's compliance with FOIA. *Id.* at 127. However, if the record "leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper." *Truitt*, 897 F.2d at 542.

"An agency that has withheld responsive documents pursuant to a FOIA exemption can carry its burden to prove the applicability of the claimed exemption by affidavit." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (citing *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 926 (D.C. Cir. 2003)). "Summary judgment is warranted on the

basis of agency affidavits when the affidavits describe the justifications for nondisclosure with

reasonably specific detail, demonstrate that the information withheld logically falls within the

claimed exemption, and are not controverted by either contrary evidence in the record nor by

evidence of agency bad faith." *Id.* (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir.

1984)); *see also Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981); *Larson*,

565 F.3d at 862.

"FOIA represents a balance struck by Congress between the public's right to know and

the government's legitimate interest in keeping certain information confidential." *Ctr. for Nat'l*

*Sec. Studies*, 331 F.3d at 925 (citing *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152

(1989)). "While these exemptions are to be 'narrowly construed,' courts must not fail to give

them 'a meaningful reach and application.'" *Id.* (internal citations omitted). "Ultimately, an

agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or

'plausible.'" *Larson*, 565 F.3d at 862 (quoting *Wolf v. CIA*, 473 F.3d 370, 374-75 (D.C. Cir.

2007)).

## II.     ADEQUACY OF SEARCH

Defendant properly relies upon a reasonably detailed affidavit that demonstrates the

adequacy of the search. *Perry*, 684 F.2d at 126. As Senior Counsel Alison M. Thro explains, the

Board does not maintain a centralized database containing all of the Board's records that would

thereby allow the Board to locate all responsive documents with a simple keyword search. (Thro

Decl. ¶ 11.) Instead, FOIA searches are conducted by the Legal Division of the Board, which

contacts areas and staff members responsible for the subject matter involved in a request. (*Id.* ¶

10-11.) These staff members are then asked to manually search for responsive records or, where

possible, to conduct an electronic search. (*Id.* ¶ 11.)

In responding to GATA's 2009 FOIA request, Thro explains that she contacted the Legal Division FOIA staff who had worked on plaintiff's 2007 FOIA request and obtained the documents withheld in response to that request. (*Id.*)

Second, the Board's Office of the Secretary ("OSEC") searched its FOIA tracking system database for FOIA requests submitted by others persons that requested records relating to "gold swap," "gold swaps," or "gold swapped." (*Id.* ¶ 14.) Thro explains that this database tracks the subject matter of FOIA requests submitted to the Board, and therefore, any previous FOIA request relating to "gold swaps" would have been located through this computerized search. (*Id.*) The only reference uncovered by this search was plaintiff's own 2007 FOIA request. (*Id.*)

OSEC also maintains records in a database known as the Federal Reserve Integrated Records Management Architecture ("FIRMA"). (*Id.* ¶ 11.) Thro explains in great detail how OSEC staff conducted both an electronic search of the FIRMA database, as well as a manual search of other OSEC records for any documents relating to gold swaps. (*Id.* ¶ 15.) These searches did not uncover any responsive records. (*Id.*)

Legal Division FOIA staff also contacted subject matter experts within the Legal Division and at FRBNY. (*Id.* ¶ 16.) These individuals were identified because of their familiarity with the subject of gold swaps and had been contacted in connection with GATA's 2007 FOIA request as well. (*Id.*) Thro believed "they would be most likely to have access to any new documents that may have been created" since the 2007 search. (*Id.*) These individuals conducted a manual search of their files in 2009, but did not locate any responsive documents. (*Id.*)

Finally, the Board's Legal Division contacted staff at the Federal Open Market Committee ("FOMC"). (*Id.* at 17.) The FOMC is responsible for monetary policy and is a

separate agency from the Board. (*Id.*) FOMC staff conducted a computerized search of both the FOMC Secretariat's internal document library and the Board's public website to identify any documents relating to gold swaps or containing any variation of the term "gold swap." (*Id.*) FOMC Secretariat staff believed this search would be most likely to contain any information responsive to plaintiff's FOIA request. (*Id.*) This search uncovered only two documents, both publically available. The two documents (totaling 173 pages) were provided to plaintiff, and they represent the only additional documents not identified pursuant to GATA's 2007 request. (*Id.*) These two documents (consisting of FOMC transcript materials) were provided to plaintiff in the same form in which they were previously available to the public and therefore contained some "limited redactions." (*Id.*) According to the Board, the redacted portions do not "relate in any way to gold or gold swaps." (*Id.*) The FOMC Secretariat also searched its paper files, as well as its own log of prior FOIA requests, but found no responsive documents. (*Id.*)

GATA attacks the adequacy of the Board's search on several grounds. First, it comes up with the novel argument that the Board should have identified the "records systems that were *not checked* for records responsive to GATA's FOIA request." (Pl.'s Opp. at 15 (emphasis in original).) To fulfill its obligations under FOIA, an agency must "provid[e] 'a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials . . . were searched.'" *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 313-14 (D.C. Cir. 2003) (quoting *Valencia-Lucena*, 180 F.3d at 326 and *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). The Board has clearly met this burden, and is not required, as plaintiff suggests, to provide an additional list of each place it did *not* search.

GATA claims that the Board "presumably" did not seek records from "other potential sources," including the other eleven regional federal reserve district banks (in addition to FRBNY), and it cites this fact as evidence of the inadequacy of the Board's search. (Pl.'s Opp. at 16, 23-24.) As explained by Ms. Thro, the "subject matter experts in the Legal Division at the Federal Reserve Bank of New York" were consulted specifically because of their familiarity with gold swaps (Thro Decl. ¶ 16) and because of the unique gold custodial services provided to foreign governments by FRBNY. (Fogarty Decl. ¶¶ 2, 7.) Plaintiff provides no evidence to support an inference that the other eleven regional federal reserve district banks conducted similar transactions, provided services involving gold, or would have similar expertise regarding gold swaps, let alone evidence that "raises substantial doubt" as to the adequacy of the Board's search. *See Iturralde*, 315 F.3d at 314.

Similarly, plaintiff claims that the search was inadequate because some of the materials provided by the Board had previously been redacted by the FOMC. (Pl.'s Opp. at 17-19.) GATA claims the Board should have referred its 2009 FOIA request to the FOMC for a separate response. (*Id.*) As detailed in Ms. Thro's declaration, however, the Board contacted the FOMC Secretariat, which itself conducted its own search of the FOMC records for responsive documents. (Thro Decl. ¶ 17.) Indeed, this search revealed the only two additional documents not encompassed by GATA's 2007 request. Plaintiff does not specify how a separate referral of its FOIA request to the FOMC would be reasonably likely to produce additional materials, particularly in light of the fact that plaintiff subsequently submitted a separate FOIA request to FOMC. (Pl.'s Opp. at 19 n.14.) As for the redacted portions of the FOMC transcripts, both the Board and the FOMC have indicated to GATA that these portions do not in any way pertain to gold or gold swaps. (*Id.*; Thro Decl. ¶ 17.)

Next, GATA attacks the search on the grounds that most of the documents withheld have "nothing to do with 'gold swaps'" and claims that the Board "has provided no reasonable explanation" as to why this is the case. (Pl.'s Opp. at 15.) As the Board explained, these documents are responsive to GATA's current FOIA request only because they were withheld in response to the 2007 FOIA request. (Thro Decl. ¶ 19.) The documents were deemed responsive to *that* request because broader search criteria were used in order to identify any document "that could conceivably be related" to gold swaps. (*Id.*) This broader search therefore identified documents relating *either* to gold *or* to swaps and resulted in the identification of many documents that evidently did not pertain to "gold swaps."[3] (*Id.*) While these facts could indicate that the 2007 FOIA search was *overbroad*, they do not serve to undermine the *adequacy* of the 2009 search.

GATA provides a number of declarations in an attempt to support its argument that the Board's search was inadequate. These declarations explain the nature of gold swaps, describe them as one of the mechanisms used by the United States to secretly manipulate currency and gold markets, and express incredulity at the Board's "oblivious[ness]" to these facts and the "inconceivable" lack of documents supporting them. (Powell Decl.; Douglas Decl.; Turk Decl.; Pl's Opp. at 21-23.) However, such "speculation as to the existence of additional records . . . does not render the searches inadequate." *Concepcion v. FBI*, 606 F. Supp. 2d 14, 30 (D.D.C. 2009); *see also SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991) ("Mere speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search for them.").

---

[3] Having reviewed the withheld documents *in camera*, the Court agrees with the Board's assertion that the vast majority of them do not mention or pertain to gold swaps.

Finally, plaintiff challenges the *results* of the search, complaining that the Board "has identified very few records" and noting that the search failed to uncover a 2005 paper published on the Board's website that mentioned gold swaps conducted by a foreign government. (Pl.'s Opp. at 19 and n.15.) "[T]he adequacy of a FOIA search," however, "is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search," and it "is long settled that the failure of an agency to turn up one specific document in its search does not alone render the search inadequate." *Iturralde*, 315 F.3d at 315.

In sum, plaintiff's arguments fail to raise "substantial doubt" as to the adequacy of the Board's search, *id.* at 314, and thus, the Court grants summary judgment to the defendant on this issue.[4]

## III.    FOIA EXEMPTION 5

Exemption 5 allows an agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552 (b)(5). "To qualify, a document must thus satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standard that would govern litigation against the agency that holds it." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001); *see NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 148 (1975); *EPA v. Mink*, 410 U.S. 73 (1973). Among the privileges incorporated by FOIA Exemption 5 are the "deliberative process" privilege and the "attorney work product" privilege. *Klamath*, 532 U.S. at 8; *see Loving v. Dep't of Defense*, 550

---

[4] Plaintiffs have also requested discovery on the adequacy of the Board's search. (Plaintiff's Motion for Discovery at 4.) Discovery is generally unavailable in FOIA actions, *Judicial Watch, Inc., v. DOJ*, 185 F. Supp. 2d 54, 65 (D.D.C. 2002), and "should be denied where an agency's declarations are reasonably detailed, submitted in good faith and the court is satisfied that no factual dispute remains." *Schrecker v. DOJ*, 217 F. Supp. 2d 29, 35 (D.D.C. 2002). This case does not merit an exception to this rule.

F.3d 32, 37 (D.C. Cir. 2008); *Baker & Hostetler LLP v. Dep't of Commerce*, 473 F.3d 312, 321

(D.C. Cir. 2006).  The Board claims that Exemption 5 protects from disclosure a substantial

majority of the documents or portions thereof sought by GATA. (*Vaughn* Index Item Nos.

["Documents"] 1-6, 9-10, 11-20, and portions of Documents 7, 8, and 11.)  Plaintiff challenges

the Board's reliance on Exemption 5.

All of the Board's Exemption 5 claims rest at least in part on the deliberative process

privilege.  The deliberative process privilege "covers 'documents reflecting advisory opinions,

recommendations and deliberations comprising part of a process by which governmental

decisions and policies are formulated.'"  *Klamath*, 532 U.S. at 8 (quoting *NLRB v. Sears*, 421

U.S. at 150.)  The privilege "rests on the obvious realization that officials will not communicate

candidly among themselves if each remark is a potential item of discovery and front page news,

and its object is to enhance 'the quality of agency decisions.'"  *Id.* at 8-9 (quoting *Sears*, 421

U.S. at 151.); *see Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 256 (D.C.

Cir. 1977) (purpose is to protect the "quality of administrative decision-making [which] would

be seriously undermined if agencies were forced to 'operate in a fishbowl' because the full and

frank exchange of ideas on legal or policy matters would be impossible"); *Dudman Commc'ns*

*Corp. v. Dep't of the Air Force,* 815 F.2d 1565, 1568 (D.C. Cir. 1987) (privilege "rests most

fundamentally on the belief that were agencies forced to 'operate in a fishbowl,' the frank

exchange of ideas and opinions would cease and the quality of administrative decisions would

consequently suffer" (internal citations omitted)).

For the deliberative process privilege to apply, the material must be both "predecisional"

and "deliberative."  *Loving v. Dep't of Defense*, 550 F.3d 32, 38 (D.C. Cir. 2008); *In re Sealed*

*Case*, 121 F.3d 729, 737 (D.C. Cir. 1997).  A document is predecisional if it is "generated before

the adoption of an agency policy." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). To demonstrate that a document is predecisional, the burden is on the agency to "establish[ ] what deliberative process is involved, and the role played by the documents in issue in the course of that process." *Id.* at 868. A document is deliberative if it "reflects the give-and-take of the consultative process." *Id.* at 866. The deliberative process privilege generally does not cover the purely factual portions of documents, except in cases where the factual material "is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations." *In re Sealed Case*, 121 F.3d at 737; *see also Quarles v. Dep't of the Navy*, 893 F.2d 390, 392 (D.C. Cir. 1990) (disclosure of certain factual information can "expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions" (quoting *Dudman*, 815 F.2d at 1568)).

Plaintiff challenges the Board's invocation of the deliberative process privilege primarily on the grounds that they are not predecisional, deliberative communications, because "there is no description of the decision they preceded or to which they were related" (Pl.'s Opp. at 26), and because the Board has failed to "demonstrate the decision to which [each] communication related," (*Id.* at 29).

Courts, however, are reluctant to force agencies to expose their decisionmaking processes. *See, e.g.*, *Sears*, 421 U.S. at 151-152 (noting that courts draw a line between "predecisional communications, which are privileged, and communications made after the decision and designed to explain it" (internal citations omitted)). The Supreme Court observed that "[a]gencies, are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen

into agency decisions; and the lower courts should be wary of interfering with this process." *Id.* at 151 n.18. Thus, even if an internal discussion does not lead to the adoption of a specific government policy, its protection under Exemption 5 is not foreclosed as long as the document was generated as part of a definable decision-making process. *See Petroleum Info. Corp. v. U.S. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992). Thus, GATA is incorrect when it states that the Board must identify a specific decision corresponding to each communication. As the Supreme Court explained in *Sears*, "[o]ur emphasis on the need to protect pre-decisional documents does not mean that the existence of the privilege turns on the ability of an agency to identify a specific decision in connection with which a memorandum is prepared." *Sears*, 421 U.S. at 151 n.18.

Having examined each of the documents at issue *in camera*, the Court will now turn to GATA's challenges to the Board's invocation of the deliberative process privilege as to specific documents.

### 1.    Documents 1-6

Documents 1 through 6 relate to a 1993 memorandum analyzing the economic impact on the price of gold if all official gold were sold. (Thro Decl. ¶ 23.) Document 1 is an email exchange between Dale Henderson and Ted Truman, the then director of the Board's Division of International Finance. (*Id.*) The redacted portions represent Truman's comments and questions about Henderson's memorandum, as well as Henderson's answers to these questions. (*Id.*)

Document 2 is a January 18, 1993 draft of the memorandum itself. (*Id.*)

Documents 3 through 6 are February 23, 1993 versions of the memorandum, along with transmittal memoranda from Messrs. Truman and Henderson, provided to Federal Reserve Board Chairman Alan Greenspan, Undersecretary of the Treasury for International Affairs Jeffrey Shafer, and Board Governor Janet Yellen. (*Id.*)

Ms. Thro avers that these memoranda are typical of analyses provided to senior Board members and staff in order to inform their consideration of monetary policy. (*Id.*)

Plaintiff argues, in essence, that only the early drafts of documents may be validly withheld pursuant to Exemption 5, and that once a memorandum becomes finalized it can no longer be "predecisional." (Pl.'s Opp. at 30-32.) Such a narrow view of Exemption 5 ignores the possibility, as here, that a memorandum may not represent final agency policy, but rather the "the staff's recommendations and advice regarding possible ways to proceed and consequences associated with proceeding in a certain manner." (Thro Decl. ¶ 23.)

Having reviewed the declaration of Ms. Thro, the *Vaughn* Index, and these documents *in camera*, the Court is satisfied that the redacted portions of Documents 1 through 6 are predecisional and deliberative and therefore may be properly withheld under Exemption 5.

### 2.     Documents 7-8

Documents 7 and 8 relate to a review of the Federal Reserve System currency swap arrangements with foreign central banks, and consist of a cover memorandum to Chairman Alan Greenspan seeking guidance on how to proceed with the proposed review and drafts of a memorandum analyzing the existing swap agreements and containing the staff's opinions and recommendations relating to these agreements. (*Id.* ¶ 24.) The documents do not describe or reflect any decision actually taken, but rather are directed to senior Board and FOMC officials for their consideration of the matter. (*Id.*)

Based on the declaration of Ms. Thro, the *Vaughn* Index, and an *in camera* review of the documents, the Court concludes that the redacted portions of Documents 7 and 8 are predecisional and deliberative, and therefore may be properly withheld pursuant to Exemption 5.

### 3.     Document 9

Document 9 is a draft briefing paper containing economic analysis of the consequences of a change in gold policies by governments, as well as a transmittal memorandum commenting on the same. (*Id.* ¶ 25.) The Court concludes, based on its review, that it has properly been withheld under Exemption 5.

### 4. Document 10

Document 10 consists of a staff member's notes on the discussion by the Gold and Foreign Exchange Committee of the Group of Ten (or "G-10"), as well as a transmission memorandum from Mr. Truman to the Board. (*Id.*) The Board maintains that these notes are deliberative and predecisional because they are not a "verbatim recounting" of the meeting, but rather represent the author's "analysis" of the participants' views. (*Id.*; *Vaughn* Index.) Having reviewed the document *in camera*, it is apparent that these notes do not reflect "the writer's analytical views regarding the matters discussed" (*Vaughn* Index), but rather are a straightforward *factual* recounting of a meeting with representatives of foreign central banks, detailing what each of the participants said. The Court therefore finds that Document 10 in its entirety is factual, not deliberative, and has not properly been withheld under Exemption 5.

### 5. Document 11

Document 11 consists of a memorandum to the Board regarding a proposed commercial transaction by a foreign central bank. (Thro Decl. ¶ 26.) The memorandum and its attachments contain analysis and discussion of the proposed transaction, as well as an analysis of legal issues raised by the proposal. (*Id.*) Plaintiff asserts, without explanation, that only a portion of this document (a two-page staff comment) can validly qualify under Exemption 5. After reviewing the document *in camera*, the Court concludes that none of the documents specifies a final Board policy or explains the reasons behind a Board decision. Rather, the documents are exactly as Ms. Thro describes them, a "candid analysis and discussion" of a proposed transaction. (*Id.*) As

such, they are plainly deliberative and predecisional, and therefore properly withheld under

Exemption 5.[5]

### 6. Document 12

Document 12 is a legal memorandum from a staff attorney in the Board's Legal Division

to an officer in the Legal Division analyzing the legal authority of the Federal Reserve Banks to

engage in transactions involving gold. (*Id.* ¶ 27.) Having reviewed the document *in camera*, the

Court agrees that it is predecisional and deliberative, as well as covered by the attorney-client

privilege. It is therefore properly withheld under Exemption 5.

### 7. Documents 13-14

Documents 13 and 14 are emails among Board staff regarding the appropriate response to

inquiries regarding claims that the Federal Reserve Board manipulates the gold market. (*Id.*

¶ 28.) The emails discuss how inquiries might best be responded to and who should respond.

(*Id.*) They are plainly predecisional and deliberative and properly withheld under Exemption 5.

### 8. Document 15

Document 15 is a September 17, 2001 draft document entitled "Confidential Draft:

Potential repo/swap involving Treasury gold." (*Id.* ¶ 29.) The document identifies issues that

would be raised if a swap or repurchase transaction involving Treasury gold were to occur. (*Id.*)

The document contains handwritten notes by a reviewer, as well as the reviewer's handwritten

notes and comments of a conversation relating to gold held by the U.S. Treasury. (*Id.*)

Plaintiff's only challenge to the document is that it fails to explicitly specify what policy or

decision it relates to. (Pl.'s Opp. at 35.) The Court rejects this argument for the reasons

---

[5] The Court therefore need not address whether the portions of Document 11 may also be exempt from disclosure pursuant to the attorney-client privilege, but it is clear from a review of the cover memo that it is protected by the privilege.

explained above, and having reviewed the document *in camera*, the Court agrees that it is deliberative and predecisional and is protected by Exemption 5.

### 9.    Documents 16 and 18-20

Documents 16, 18, 19, and 20 are drafts of letters to members of Congress or others responding to inquiries regarding the Federal Reserve and gold swaps or other issues relating to gold. (Thro Decl. ¶ 30.) Documents 16 and 20 are drafts of letters to members of Congress for which the Board was unable to locate a final letter. (*Id.*) Given the search conducted by the Board, Ms. Thro avers that it is her belief that a final letter, had it been sent, would have been located by the search. (*Id.*) Therefore, Ms. Thro believes Documents 16 and 20 represent drafts of letters that were never finalized. (*Id.*) Documents 18 and 19 are drafts of a letter to Rep. Ron Paul regarding an inquiry he made to the Board. (*Id.*) The "limited redactions" in these drafts withhold only the material not included in the final letter, which was provided to GATA in 2007. (*Id.*)

With respect to the final letters, which have already been provided to plaintiff, the Court agrees that disclosure of the draft letters would reveal the predecisional, deliberative process of the agency in formulating the content of the final letters. Therefore, Documents 16, 18, 19, and 20 are properly withheld pursuant to Exemption 5.

### 10.    Document 17

Document 17 is an email exchange among Board and FRBNY staff discussing what information to include in response to requests from Congress regarding the Federal Reserve's involvement in gold. (*Id.*) Such a discussion is predecisional and deliberative and thus properly withheld by the Board under Exemption 5.

## IV.    FOIA EXEMPTION 4

The Board has withheld portions of Document 11, as well as three footnotes from Documents 7 and 8 under FOIA Exemption 4.  Exemption 4 exempts from disclosure information that is (1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential.  5 U.S.C. § 552(b)(4).

Where the information is "commercial or financial information obtained from a person" (including corporations), the key inquiry is whether that information is "privileged or confidential."  Frequently this inquiry focuses on whether the information is "confidential."  The D.C. Circuit has set out a multi-part test for determining whether information is "confidential."  First, the court must determine whether the information was submitted to the government voluntarily.  *McDonnell Douglas Corp. v. NASA*, 180 F.3d 303, 304 (D.C. Cir. 1999).  If it was, then the court must look to see whether the submitted information is "the kind of information 'that would customarily not be released to the public by the person from whom it was obtained.'"  *Id.* at 304-05 (quoting *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 879 (D.C. Cir. 1992) (en banc)).  If it is, then the information is "confidential" and protected from disclosure by Exemption 4.  *Critical Mass*, 975 F.2d at 880.  If the submission of the information was compelled, however, then the court must determine whether its disclosure "would be likely either (1) to impair the government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained."  *NASA*, 180 F.3d at 305 (citing *Critical Mass*, 975 F.2d at 878-80; *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974) ("*National Parks I*")).  If the party seeking nondisclosure can show either impaired government ability to obtain necessary future information or substantial competitive harm, then the information is

"confidential" and protected from disclosure by Exemption 4. *National Parks I*, 498 F.2d at 770-71.

Documents 7 and 8 include information provided by foreign central banks ("FCBs") regarding potential draws on currency swap arrangements or inquiries about swap arrangements that were never actually entered into. (Dzina Decl. ¶ 6.) Document 11 is a memorandum discussing a proposal by the FRBNY to open a Special Purpose Gold Custody Account at the request of a U.S. bank to hold gold in connection with a swap agreement between the domestic bank and an FCB. (*Vaughn* Index; Fogarty Decl. ¶¶ 4, 11.) Document 11 contains the names of a FCB, the name of the bank with which it proposed to do business, as well as the details of the proposed transaction and discussion of FRBNY's relationships with its other customers. (Fogarty Decl. ¶¶ 4, 11.)

The Board has satisfied its burden under Exemption 4. First, the information withheld pursuant to Exemption 4 is commercial and financial in nature, as it details banking "transactions" and "account arrangements" or "potential transactions" involving FCBs. (Fogarty Decl. ¶ 4; Dzina Decl. ¶ 4.) While plaintiff argues that "other interests" may be at stake as well, this does not negate the obviously commercial and financial nature of the withheld information.

Second, the information was obtained from "persons" as defined by FOIA. Specifically, the information was obtained from FCBs, which are the central banks of foreign governments. (Fogarty Decl. ¶¶ 2, 6, 11, 12; Dzina Decl. ¶¶ 2, 4.) As such, they are agencies of foreign governments" and are therefore "persons" under FOIA. *Stone v. Export-Import Bank*, 552 F.2d 132, 137 (5th Cir. 1977). Although some of the withheld portions of Documents 7, 8, and 11 were created by the FRB and the FRBNY, this does not preclude the application of Exemption 4. An agency may withhold portions of its own reports containing information "supplied by" third

parties. *Gulf & West. Indus., Inc. v. United States*, 615 F.2d 527, 529-30 (D.C. Cir. 1980); *see also Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 148-49 (2d Cir. 2010) (distinguishing information "obtained from" an outside person seeking to enter into a transaction from information pertaining to the completed transaction itself).[6]

Finally, the information is confidential, as the FCBs provided it voluntarily and do not customarily release such information to the public. In determining whether the information was provided voluntarily, "actual legal authority, rather than the parties' beliefs or intentions, governs judicial assessments of the character of submissions." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 149 (D.C. Cir. 2001.) GATA argues that once the "FCBs elected to enter into such transactions, the parties were required to provide the information to [the Board]." (Pl.'s Opp. at 43.) Since plaintiff fails to cite any source that grants the Board the legal authority to compel any such production from the FCBs, the "agency has no authority to enforce an information request, [and the] submissions are not mandatory." *Ctr. for Auto Safety*, 244 F.3d at 149. Here, it is clear that the Board lacked the legal authority to compel the FCBs to submit, for example, inquiries about potential swap agreements, draws on existing swap agreements, or the details of a proposed transaction with a U.S. domestic bank. The Court therefore concludes that the information withheld by the Board pursuant to Exemption 4 was submitted voluntarily.

---

[6] Plaintiff admits that "[t]o the extent the records contain and disclose information provided by FCBs, it could possibly be considered information obtained from a 'person,'" but nevertheless argues that a substantial portion of these documents could still be disclosed. (Pl.'s Opp. at 40-41.) The Court notes that only certain portions of Document 11 and just three footnotes in Documents 7 and 8 were withheld pursuant to Exemption 4, and the remainder of these documents were properly withheld pursuant to Exemption 5, so there is no merit to plaintiff's argument.

Finally, the FCBs discussed in Documents 7, 8, and 11 do not customarily disclose to the public the information withheld by the Board.  (Fogarty Decl. ¶¶ 2, 13, 14; Dzina Decl. ¶¶ 2, 9.)  Plaintiff does not appear to challenge this contention.

Therefore, the Board has properly withheld portions of Documents 7, 8, and 11 under Exemption 4.

## V.     SEGREGABILITY

GATA challenges the Board's segregability analysis at various points throughout its opposition.  FOIA requires that an agency produce "[a]ny reasonably segregable portion" of a record that is not exempt from disclosure.  5 U.S.C. § 552(b).  To meet the segregability requirement, agency declarations must show why any withheld documents cannot be further segregated "with reasonable specificity."  *Armstrong v. Executive Office of the President*, 97 F.3d 575, 578 (D.C. Cir. 1996).  According to the Thro Declaration, each "document was reviewed for any reasonably segregable material that was not subject to an exemption, and non-exempt portions were provided to the plaintiff."  (Thro Decl. ¶ 20.)  "Where a page contained information that was to be withheld from the plaintiff, it was evaluated to ensure that any information that was not subject to an exemption could be segregated and released."  (*Id.*)  "This process resulted in the release in part of 19 out of 20 documents."  (*Id.*)  Ms. Thro avers that "[i]t was not possible to disclose any additional portions, as any releasable material was inextricably intertwined with exempt information such that disclosure would reveal the exempt information."  (*Id.*)

Having reviewed these documents *in camera*, the Court is satisfied that defendant has produced all reasonably segregable nonexempt material.

## CONCLUSION

For the foregoing reasons, the Court grants defendant's motion for summary judgment with the exception of Document 10, which the Board must produce to GATA on or before February 18, 2011.  A separate order accompanies this Memorandum Opinion.


_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:   February 3, 2011